UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KIM MARIE GRIEVSON,

                    Plaintiff,                          <u>DECISION & ORDER</u>

                                                        06-CV-6240P
          v.

THE ROCHESTER PSYCHIATRIC CENTER,

               Defendant.

_____


## <u>PRELIMINARY STATEMENT</u>

          In May 2006, plaintiff Kim Marie Grievson commenced this lawsuit against the

Rochester Psychiatric Center under the Americans with Disabilities Act (the "ADA"), 42 U.S.C.

§ 12132, and the Federal Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794.

(Docket # 1).  In June 2009, the parties reached a resolution of plaintiff's claims, which is

reflected in a written Stipulation and Order of Settlement signed by counsel and entered by

United States District Judge Michael A. Telesca.  (Docket # 40).  The terms of the stipulated

order provided that the issue of attorneys' fees and costs, if not subsequently resolved by the

parties, would be determined by the court "upon motion to be made at a later date."  (*Id*. at ¶ 2).

That motion is now pending before this Court.[1]  (Docket # 47).

_____

          [1]  On July 21, 2009, the parties consented to the disposition of this case by a magistrate judge, pursuant to
28 U.S.C. § 636(c).  (Docket # 43).

## PROCEDURAL BACKGROUND

This lawsuit arises from plaintiff's twenty-one day stay in the Rochester Psychiatric Center ("RPC") between August 31, 2005 and September 21, 2005. (Docket # 1). Plaintiff, who is Deaf, claims that she was denied "meaningful access to [RPC's] services, programs and activities" as a result of her hearing disability. (*Id*. at ¶ 42). Specifically, she alleges that during her stay in RPC's Alternative Living Residence, a residential program for adults with psychiatric disabilities, RPC denied her requests for an American Sign Language interpreter and access to a TTY teletypewriter and computer. As a result, plaintiff was unable to communicate effectively with either RPC staff members or individuals outside RPC, including her family and her counselor. Among other things, those impediments hindered plaintiff's ability to search for an apartment, which was one of the goals of the RPC program.

Plaintiff's complaint sought monetary and injunctive relief under the ADA and the Rehabilitation Act. *See* 29 U.S.C. § 794a; 42 U.S.C. § 12133. See also *Henrietta D. v. Bloomberg*, 331 F.3d 261, 291 (2d Cir. 2003) ("injunctive relief to remedy a violation of the ADA or Rehabilitation Act is appropriate if it provides the injured plaintiff with "meaningful access to the programs to which the plaintiff is facially entitled"), *cert. denied*, 541 U.S. 936 (2004). Plaintiff's complaint also requested a discretionary award of attorneys' fees and costs, which both statutes also authorize to prevailing parties.

Shortly after the Rule 16 conference in September 2006, the parties commenced settlement negotiations. Those negotiations occurred periodically through most of 2007 and included several conferences with this Court, some in-person and some telephonic. In all of those conferences, plaintiff's settlement demand included both monetary and injunctive

components.  It was not until December 2007 that counsel for defendant first indicated to this Court that defendant was opposed to any form of injunctive relief because it believed that plaintiff lacked standing to assert claims for injunctive relief.

At that point, the parties commenced discovery in earnest (which had been extended several times in view of the ongoing negotiations).  Over the course of the next six months, written discovery was exchanged and reviewed, and eight depositions were conducted, consisting of seven depositions of defendant's employees and a two-day deposition of plaintiff. (*See* Docket # 55 at ¶¶ 29-30).

In August 2008, following a change in its counsel, defendant sought to reinitiate settlement negotiations with plaintiff.  Those negotiations occurred fitfully over the next eight months, accompanied by six extensions of the deadline for filing summary judgment motions. (Docket ## 25, 26, 27, 29, 30, 32).  In a letter dated February 6, 2009, counsel for defendant stated, "while defendant's position is that plaintiff has no standing to seek injunctive relief, I have been authorized to provide you with a list of changes made at RPC since plaintiff's stay . . . in 2005."  (Docket # 69 (Defendant's Exhibit ("Ex.") 1)).  The letter then proceeded to describe the various changes.  (*Id*.).

This Court held a settlement conference on April 16, 2009.  Plaintiff made no demand for injunctive relief at that time.  The mediation was not successful principally because of the parties' dispute over the appropriate amount of attorneys' fees.  Although plaintiff was willing to settle her claims and submit to the Court for determination the question of attorneys' fees, defendant persisted in its position that both issues should be resolved by negotiation.  The next day plaintiff filed a motion for summary judgment.  (Docket # 34).

Two months after plaintiff filed her summary judgment motion, she negotiated a stipulation of settlement with defendant. At the parties' request, the terms of the agreement were ordered by the Court on June 17, 2009. (Docket # 40). The agreement provided that defendant would pay plaintiff $14,000 "in full satisfaction of all her claims for damages and injunctive relief." (*Id*. at ¶ 2). As explained above, the parties agreed that the sum did not encompass plaintiff's claim for attorneys' fees and costs, which would be submitted to the Court for determination in the event that the parties were unable to resolve that issue. (*Id*.). The agreement further provided that the Court would retain jurisdiction "solely for purposes of enforcing th[e] Stipulation of Settlement and Order and to determine the attorney fee issue." (*Id*.).

On November 16, 2009, plaintiff filed the instant motion for attorneys' fees and costs. (Docket # 47). The motion originally sought an award of $105,191.55, comprised of $102,620.55 in fees and $2,571 in costs. (*Id*.). Since that time, plaintiff has adjusted the total sum sought to $110,042.50,[2] which reflects reductions for duplicative and erroneous billing entries, additions for attorney time spent litigating the attorneys' fees motion and an increase of $1,320 in costs for interpretive services. (Docket # 54).

Defendant does not oppose an award of attorneys' fees and costs to plaintiff as a prevailing party under the ADA and the Rehabilitation Act, but contends that the amount sought

---

[2] That amount includes fees in the amount of $72,912.45 for 373.91 hours of work performed by Michael Mulé, Esq., at an hourly rate of $195, $18,187.50 for 72.75 hours of work by Bradley Kammholz, Esq., at an hourly rate of $250, and $15,052.50 for 60.21 hours of work by Peter Dellinger, Esq., at an hourly rate of $250. (Docket # 54 at 10).

is excessive.  Defendant instead asks the Court to award a sum of $51,698.50.  (Docket # 51 at 4-5).

This Court heard oral argument on February 9, 2010.  (Docket # 68).  The following constitutes this Court's decision and order on the pending motion.

## DISCUSSION

### I.  Applicable Legal Standards

The ADA and the Rehabilitation Act both contain fee-shifting provisions affording discretion to the court to award attorneys' fee and costs to a prevailing party.  The ADA provides:

> In any action or administrative proceeding commenced pursuant to this Act, the court or agency, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs.

42 U.S.C. § 12205.  The Rehabilitation Act includes a provision with almost identical language permitting a discretionary award of attorneys' fees and costs.  *See* 29 U.S.C. § 794a(b).

A prevailing party is one who achieves a "material alteration of the legal relationship of the parties," *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 604 (2001) (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989)), provided the alteration is a "judicially sanctioned change."  *Id*. at 605.  Such judicially-sanctioned alterations may be achieved by an enforceable judgment or by a settlement agreement enforced through a consent decree.  *Id*. at 604.  Even a private settlement agreement over which a district court retains enforcement jurisdiction "entails

a level of judicial sanction sufficient to support an award of attorney's fees." *Roberson v. Giuliani*, 346 F.3d 75, 82 (2d Cir. 2003).

In deciding the amount of attorneys' fees to be awarded to a prevailing party, the court must determine the lodestar figure, *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1672 (2010), known in this Circuit as the "presumptively reasonable fee," *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).[3] Indeed, the Supreme Court has recently reaffirmed the lodestar method as appropriate for arriving at a fee that is "presumptively" reasonable and "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue*, 130 S. Ct. at 1672-73. In the Court's judgment, the lodestar method, with its emphasis on prevailing market rates in the community, is preferable to the method set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), which lists twelve factors for a court to consider in setting a reasonable fee:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

---

[3] Although the Second Circuit expressly abandoned the use of the term "lodestar" in *Arbor Hill*, the Supreme Court reaffirmed its use in a post-*Arbor Hill* decision. *See Perdue v. Kenny A.*, 130 S. Ct. at 1672 ("the lodestar figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence") (internal quotation omitted).

*Perdue*, 130 S. Ct. at 1672 n.4.  As the Court reasoned, the lodestar method results in a presumptively reasonable fee precisely because it "includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," such as the novelty and complexity of a case and the quality of an attorney's performance – factors that will be subsumed in the determination of reasonable hours spent and reasonable hourly rates, respectively.  *Id*. at 1673 (internal quotation omitted).

Calculating the lodestar figure begins with an examination of the prevailing hourly rates in the community in order to "*roughly* approximate[] the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."  *Perdue*, 130 S. Ct. at 1672.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Ctny. of Albany*, 522 F.3d at 190 (court must determine the "reasonable hourly rate . . . a paying client would be willing to pay," recognizing that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively").  Once the reasonable hourly rate is determined, it must then be multiplied by the number of hours reasonably expended litigating the case in order to arrive at the lodestar figure or "presumptively reasonable fee."  *Id*. at 193.  The reasonableness of that amount "does not depend on whether the attorney works at a private law firm or a public interest organization."  *Arbor Hill*, 522 F.3d at 184 n.2.  *See Blum v. Stenson*, 465 U.S. 886, 894 (1984) ("Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization").

The most critical factor in determining a reasonable fee is "the degree of success obtained" by the prevailing party.  *Barfield v. New York City Health and Hospitals Corp.*, 537

F.3d 132, 152 (2d Cir. 2008) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992); *Kassim v. City of Schenectady*, 415 F.3d 246, 254 (2d Cir. 2005)).  "Both 'the quantity and quality of relief obtained,' as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved."  *Id*. (quoting *Carroll v. Blinken*, 105 F.3d 79, 81 (2d Cir. 1997)).  Even if the plaintiff does not prevail on all her claims in the lawsuit, her attorneys' fees should not be reduced "[w]here [she] has obtained excellent results."  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).  Where, on the other hand, she "has achieved only partial or limited success," the fee may require reduction.  *Id*. at 436.

Although the court should consider reducing a fee to account for a party's limited success, it should not reduce a fee because "the fee would be disproportionate to the financial interest at stake in the litigation."  *Kassim v. City of Schenectady*, 415 F.3d at 252.  Avoiding this impermissible consideration is especially important in civil rights cases because "if private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court."  *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (internal quotation omitted).  *See Perdue*, 130 S. Ct. at 1676 (fee-shifting provisions in civil rights statutes "serve[] an important public purpose by making it possible for persons without means to bring suit to vindicate their rights"); *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986) ("a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards").

## II. **Reasonable Hourly Rates**

To determine a reasonable hourly rate, the court must examine "the prevailing market rates in the relevant community." *Perdue*, 130 S. Ct. at 1672 (quoting *Blum v. Stenson*, 465 U.S. at 895). *See also Simmonds v. New York City Dep't of Corr.*, 2008 WL 4303474, *3 (S.D.N.Y. 2008) ("[t]he gravamen of a reasonable rate remains the market rate that a reasonable client would expect to pay given 'the nature of the representation and type of work involved in a case'") (quoting *Arbor Hill*, 522 F.3d at 184 n.2)). The burden rests with the prevailing party to produce "satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 388 F. Supp. 2d 159, 167 (W.D.N.Y 2005) (quoting *Blum*, 465 U.S. at 895-896 n.11).

The court's inquiry on the issue of reasonable hourly rates may "include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district" and should include "an evaluation of evidence proffered by the parties." *Farbotko v. Clinton Cnty. of New York*, 433 F.3d 204, 209 (2d Cir. 2005). *See also Williams v. Beemiller, Inc.*, 2010 WL 891001, *3 (W.D.N.Y. 2010) (court may rely on its own knowledge of prevailing rates to decide "what is reasonable in the relevant community") (internal quotation omitted). The relevant community is the district in which the case is litigated. *Lochren v. Cnty. of Suffolk*, 344 F. App'x 706, 708 (2d Cir. 2009); *Arbor Hill*, 522 F.3d at 191.

In this case, plaintiff's fee application encompasses work performed by three attorneys. Two of them, Michael Mulé and Peter Dellinger, were associated with the Empire

Justice Center ("EJC"), a not-for-profit legal services firm. The third, Bradley Kammholz, is a founding partner of a small private firm specializing in personal injury litigation. Plaintiff seeks reimbursement of her attorneys' fees at an hourly rate of $195 for Mulé and $250 for both Dellinger and Kammholz. Defendant urges the Court to reduce the rates to $135 for Mulé and $225 for Dellinger, and to exclude reimbursement of any time expended by Kammholz.

### A.  Michael Mulé

Mulé graduated from Albany Law School in 2005 and was admitted to practice in New York in 2006, the same year that plaintiff filed her suit. (Docket # 49 at ¶ 5). Mulé began his legal practice as EJC's Hanna S. Cohn Equal Justice Fellow, litigating civil rights and disability cases. (*Id*.). Following his fellowship, he continued his association with EJC, developing expertise in disability rights litigation for Deaf and hard of hearing persons. (*Id*.). In that capacity, he has provided various trainings on the requirements of the ADA, consulted with governmental officials on language access issues and written various articles and guides on these issues. (Docket # 56 at ¶ 13).

As further support for plaintiff's request that Mulé's time be reimbursed at an hourly rate of $195, she has submitted an affidavit of David L. Cook, Esq., an experienced and well-respected attorney with the private firm, Nixon Peabody, LLP. (Docket # 58). Cook opines that the $195 rate is "well below the marketplace rate" charged by associates at his firm with similar experience and years of practice. (*Id*. at ¶ 14). Specifically, he notes that in 2008 Nixon Peabody charged an hourly rate of $225 for work performed by a fourth-year associate who, like Mulé, was a former Hanna S. Cohen Fellow with experience in disability discrimination litigation. (*Id*. at ¶ 13).

Defendant maintains that the requested rate of $195 per hour is excessive considering Mulé's lack of experience at the time he began representing plaintiff in 2006. (Docket # 52 at 13). Well-settled authority counsels against a reduction on that basis, however. *See*, *e.g.*, *Lochren v. Cnty. of Suffolk*, 344 F. App'x at 709 (to account for the delay in payment of attorneys' fees, which sometimes may last for several years after the services were provided, courts should use "current rather than historic hourly rates") (quoting *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006)); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d at 764 ("current rates, rather than historical rates, should be applied in order to compensate for the delay in payment").

Chief Judge Skretny recently surveyed fee awards in this district and concluded that a rate of $150 per hour was "an appropriate rate" for billing by associates with comparable years of practice to Mulé's. *Williams v. Beemiller, Inc.*, 2010 WL 891001 at *4 & n.4. In *Williams*, the court reduced to $150 the hourly rates requested for several associates with similar experience, finding that "a rate of $200 for attorneys of that level of experience is excessive in this [d]istrict." *Id.* at *4. The court's finding was based upon an extensive review of recent awards by courts in this district, including those in Rochester, which revealed that hourly rates in the range of $125 to $175 were "reflective of current market rates in [the] community" for work performed by associate-level attorneys. *Id.*; *see also Disabled Patriots of Am., Inc. v. Niagara Group Hotels, LLC*, 688 F. Supp. 2d 216, 225 (W.D.N.Y. 2010) (collecting cases); *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 388 F. Supp. 2d at 171 (awarding fees to EJC attorneys in disability discrimination case at rates ranging from $150 to $250).

I find that a rate of $165 per hour, rather than $150, is appropriate for work performed by Mulé considering his expertise in language access issues. EJC's Chief Counsel, Bryan Hetherington, has affirmed that Mulé has developed into "one of the leading experts in both the state and nation on issues involving the language access rights of beneficiaries of government programs." (Docket # 56 at ¶ 12). This expertise, which bears on the legal and factual issues at the heart of plaintiff's case, justifies a modest increase in the hourly rate that is commonly utilized for associates of similar years' experience. *See Blum*, 465 U.S. at 898 ("the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates").

In making this determination, I acknowledge that the $165 rate may be less than the rate that EJC has used in recent cases to negotiate settlements of attorneys' fees with private parties. (*See* Docket # 56 at ¶ 17). I do not believe, however, that an opposing party's willingness to negotiate a settlement of attorneys' fees at a particular rate constitutes compelling evidence of what a paying client would be willing to pay at the inception of the representation. After all, many factors enter into a party's decision to settle a litigation, only one of which is consideration of the requested hourly rates of the opposing party's attorneys.[4]

### B. Peter Dellinger

Peter Dellinger is a skilled litigator with nearly thirty years of experience. (Docket # 59 at ¶¶ 4-5). For the substantial majority of that period, Dellinger has represented

---

[4] Indeed, a settlement often involves payment by the defendant of a lump sum in full satisfaction of the plaintiff's claims and attorneys' fees. That sum usually represents a compromise of the amount that the party might have been able to recover had the case been litigated to conclusion. Viewed that way, a party's willingness to pay that sum does not necessarily reflect agreement with the reasonableness of the hourly rates identified by the plaintiff.

individuals in civil rights, employment and consumer cases, many of them in federal court. (*Id.* at ¶¶ 9-18). As a senior staff attorney with EJC, Dellinger's principal role in this case was to supervise Mulé's work. That he played such a limited role is supported by the relatively few hours he logged (60.21) (*id.* at ¶ 22), compared with those logged by Mulé (373.91). (Docket # 54 at 10).

In their affidavits, Cook and Hetherington both opine that Dellinger's requested rate of $250 is below the market rate. (Docket # 58 at ¶ 5; # 56 at ¶ 6). Cook notes that the rate is less than the $275 rate that he recommended as the reasonable hourly rate for Dellinger's services in a 2008 fee application filed in another case in this district. (Docket # 58 at ¶ 5). Hetherington notes that the requested $250 rate has been used by other judges in this district to reimburse senior EJC attorneys with comparable experience to Dellinger's. (Docket # 56 at ¶¶ 5-6).

Based upon Dellinger's skill and experience, the requested hourly rate of $250 is reasonable, appropriate and in line with awards to attorneys of comparable skill and experience. *See*, *e.g.*, *Anderson*, 388 F. Supp. 2d at 171 (setting rates between $175 and $250 for senior attorneys with EJC); *Catanzano v. Doar*, 378 F. Supp. 2d 309, 314 (W.D.N.Y. 2005). *See also Williams*, 2010 WL 891001 at *4 (finding rate of $250 "appropriate" for attorney with over 30 years of federal litigation experience); *Klimbach v. Spherion Corp.*, 467 F. Supp. 2d 323, 331-32 (W.D.N.Y. 2006) (finding rate of $250 reasonable for private firm partners). *Cf. New York Life Ins. Co. v. Hassan*, 2010 WL 3070091, *3 (W.D.N.Y. 2010) ("the highest hourly rate that this [d]istrict currently awards for partners is $240"); *Disabled Patriots of Am., Inc. v. Niagara*

*Group Hotels, LLC*, 688 F. Supp. 2d at 225 ("this Court is unaware of any decision issued [after 2006] in any substantive area in which fees of more than $240 per hour were awarded").

Defendant urges this Court to set Dellinger's hourly rate at $225 as Judge Larimer did in 2005 in the *Anderson* case. (Docket # 52 at 15). I believe that the rate that a paying client would pay an attorney of Dellinger's skill and experience in 2009, when the pending motion was filed, is $250 per hour – the same rate at which awards have been made to other senior EJC attorneys with comparable experience to Dellinger's. (*See* Docket # 56 at ¶ 5).

### C. **Bradley Kammholz**

Bradley Kammholz is a well-respected personal injury attorney with nearly twenty years' experience, whose practice includes federal court litigation. (Docket # 57 at ¶ 6). Plaintiff requests that the reasonable hourly rate for his services be set at $250.

Kammholz was retained by plaintiff in this action in order to provide expertise on the calculation of damages. (*Id*. at ¶ 7). He also defended plaintiff's deposition and deposed several of defendant's employees, as well as supervised Mulé's preparation for the remaining depositions. (*Id*. at ¶ 8).

Defendant does not specifically challenge the rate requested by Kammholz as excessive. Rather, defendant maintains that no payment should be awarded for any hours expended by Kammholz because plaintiff has not demonstrated "why the services of a personal injury attorney were required in this ADA case that did not involve personal injuries." (Docket # 52 at 16).

I am satisfied that the damages issues presented in this case – namely, how to quantify the damages arising from the denial of language access devices to an individual

participating in a short-term residential program for persons with mental health issues – were

sufficiently unusual to justify retaining an attorney with specialized knowledge in emotional

injury damages. In other words, I conclude that a paying client "may well have retained

[Kammholz] as co-counsel to draw on [his] experience" and expertise. *Simmonds v. New York

City Dep't of Corr.*, 2008 WL 4303474 at *6. *See also Anderson*, 388 F. Supp. 2d at 164 ("the

use of multiple attorneys is not *per se* unreasonable"); *Williamsburg Fair Hous. Comm. v.

Ross-Rodney Hous. Corp.*, 599 F. Supp. 509, 518 (S.D.N.Y. 1984) (same). Of course, when such

a collaborative relationship is created among attorneys, their billing records must be scrutinized

for any resulting inefficiencies – an undertaking that is summarized in the following section.

*Simmonds*, 2008 WL 4303474 at *6. I further find on the record before me that $250 per hour is

a reasonable and appropriate hourly rate for an attorney of Kammholz's experience, skill and

reputation.


## III.  Reasonableness of Hours Expended

Applications for attorneys' fees should be accompanied by sufficient information

to enable the reviewing court to audit the hours and determine whether they were reasonably

expended. *Disabled Patriots*, 688 F. Supp. 2d at 226; *Anderson*, 388 F. Supp. 2d at 166. That

information generally includes, as it does here, contemporaneously-created time records

specifying "for each attorney, the date, the hours expended, and the nature of the work done."

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (citing *Hensley v. Eckerhart*, 461 U.S.

at 437 n.12). Individual entries that include only vague and generic descriptions of the work

performed do not provide an adequate basis upon which to evaluate the reasonableness of the

time spent.  *Disabled Patriots*, 688 F. Supp. 2d at 226-27 (citing cases); *Anderson*, 388

F. Supp. 2d at 166-67 (citing cases).

                In addition to reviewing the entries, the court must inquire whether the party

exercised "billing judgment" in arriving at the total number of hours requested.  *Hensley*, 461

U.S. at 434 ("[i]n the private sector, billing judgment is an important component in fee setting[;]

[i]t is no less important here") (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir.

1980)).  *See also Disabled Patriots*, 688 F. Supp. 2d at 226; *Anderson*, 388 F. Supp. 2d at

166-67.  If the attorney did not properly exercise billing judgment, then the court must reduce the

hours to exclude those that were "excessive, redundant, or otherwise unnecessary."  *Hensley*, 461

U.S. at 434.  One way to accomplish that reduction is to evaluate the reasonableness of each

individual time entry and to make reductions and exclusions as necessary.  *See, e.g.*, *Pasternak v.

Baines*, 2008 WL 2019812, *7 (W.D.N.Y. 2008); *Rich Prods. Corp. v. Impress Indus.*, 2008 WL

203020, *3 (W.D.N.Y. 2008).  Another "practical means of trimming the fat" is to apply a

reasonable percentage reduction to the total number of hours requested.  *Kirsch v. Fleet St., Ltd.*,

148 F.3d at 173 (internal quotation omitted).  *See, e.g.*, *Simmonds*, 2008 WL 4303474 at *8

(applying 40% reduction); *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 541 (S.D.N.Y. 2008)

(applying 15% reduction); *Moreno v. Empire City Subway Co.*, 2008 WL 793605, *6 (S.D.N.Y.

2008) (applying 15% reduction); *Anderson*, 388 F. Supp. 2d at 167 (applying 20% reduction);

*Elliott v. Bd. of Educ. of Rochester City Sch. Dist.*, 295 F. Supp. 2d 282, 286 (W.D.N.Y. 2003)

(applying 10% reduction); *Auscape Int'l v. Nat'l Geographic Soc'y*, 2003 WL 21976400, *5

(S.D.N.Y. 2003) (applying 20% reduction); *Sabatini v. Corning-Painted Post Area Sch. Dist.*,

190 F. Supp. 2d 509, 522 (W.D.N.Y. 2001) (applying 15% reduction).

### A. **Counsel's Exercise of Billing Judgment**

Based upon my extensive review of plaintiff's attorneys' billing records (*see* Docket # 49, Ex. B), I find that the entries generally provide an adequate description of the nature of the work performed by each attorney on a given day. I also credit Mulé's representation that counsel has exercised billing judgment to reduce the hours for which plaintiff seeks reimbursement. Specifically, Mulé has affirmed that before submitting the time records to this Court, he excluded any entries for time that he spent conferring about the case with colleagues other than Dellinger and Kammholz,[5] as well as for time that legal interns or paralegals spent working on the case. (Docket # 49 at ¶¶ 9-10). The extent of these reductions, however, is not apparent from the record before the Court.

### B. **Unrelated and Vague Entries**

Despite the general sufficiency of the time records, a modest number of entries are too vague to be properly evaluated, and others reflect work that is apparently unrelated to this case. Entries that are impermissibly vague include the following:

| Date | Attorney | Activity | Description |
|------|----------|----------|-------------|
| 11/22/06 | Mulé | Edit & Revise | [None Provided] |
| 6/19/09 | Dellinger | Misc. | Re: Status of Case |
| 1/30/06 | Mulé | Prepare For | Fax |
| 9/11/06 | Mulé | Prepare For | Discovery |
| 3/26/09 | Mulé | Review Documents | Court Approval |
| 7/20/09 | Mulé | Review Documents | Notice of Appearance |

These entries total 3.91 hours spent by Mulé and 1 hour spent by Dellinger. Entries that appear to be unrelated to the instant case include six entries made by Mulé for telephone calls occurring

---

[5] One such entry is still reflected in the records (a meeting between Mulé and Hetherington for .42 hours on May 19, 2009), which presumably should have been excluded.

in 2006 on August 2, August 17, September 1 (3 calls) and September 12.  These apparently

unrelated entries total 2.17 hours spent by Mulé.

## C.  Excessive and Redundant Hours

Of more significant concern to this Court than the small number of unrelated and

vague entries, are the greater number of entries for work that appears excessive and redundant.[6]

These hours fall within two broad, but related categories:  excessive time spent on certain tasks

and time spent by multiple attorneys performing duplicative work.

Turning first to the issue of excessive time spent on discrete projects, I begin with

an examination of the hours spent preparing the lawsuit.  The records reflect that more than

eighty hours were expended between November 2005 and May 15, 2006 (the date that the

complaint was filed), investigating, researching and filing the complaint.  Of course, some of that

time was necessarily and properly spent on pre-suit due diligence and legal research.  Some of it

was appropriately spent on careful drafting and revision of the complaint, which is indeed an

exemplary, concise and well-drafted pleading.  That said, I still find that the more than eighty

hours devoted to pre-filing work – which included no negotiations or contact with defendant's

attorneys – is unreasonably high.

I also find that the total number of hours spent by plaintiff's attorneys on

deposition-related tasks – approximately ninety-five hours – is inordinately high.[7]  While seven

depositions of defendant's employees were conducted by plaintiff's counsel, they occurred over

---

[6]  At oral argument, plaintiff's counsel conceded that two entries for duplicative work totaling one hour should be excluded (*see* entries for 2/26/07 and 12/1/08).

[7]  Approximately eight hours were spent by Mulé "digesting" deposition transcripts, a task more commonly delegated to legal assistants, whose hourly rates are lower than attorneys' rates.  Thus, absent any information as to the need for Mulé to perform that task, the associated fee appears inflated.

the course of only two days.  The plaintiff's deposition took slightly more than seven hours spread over two days.  In sum, the total number of hours spent by the attorney responsible for conducting and defending the depositions was 21.25 hours.  Much of the remaining deposition-related time involved hours spent by multiple attorneys on the same task.  For example, two of plaintiff's attorneys attended each of the eight depositions and both charged their time (*see* entries for 5/27/08, 5/28/08, 6/10/08, 6/16/08), and all three attorneys were involved at various times in the preparation for those depositions, leading to invariable, but unnecessary inefficiencies.  *See Simmonds*, 2008 WL 4303474 at *6 (co-counseling arrangement resulted in both firms' involvement in all aspects of the litigation and the expenditure of excessive hours).  In addition, some of the duplication of effort apparently resulted from the need to train and supervise Mulé, a relatively inexperienced litigator, in connection with the depositions he conducted.  That such training is crucial does not mean that a paying client, rather than the firm itself, should be expected to absorb the costs of that training.  *See Rozell v. Ross-Holst*, 576 F. Supp. 2d at 539-40 (training costs are "customarily incorporated in a firm's overhead" and should be excluded from the time records).  To the extent that counsel chose to have two attorneys attend the depositions for reasons other than to train Mulé, the justification for doing so is not evident from the record or from this Court's familiarity with the case.  *See Sabatini v. Corning-Painted Post Area Sch. Dist.*, 190 F. Supp. 2d at 521 ("[w]hile plaintiffs or their attorneys might have *preferred* to have both [attorneys] in court that day, that does not mean that it was reasonably necessary that they both attend, and presumably either one of them could have argued the motion alone") (emphasis in original).

In a similar vein, the time records reflect time allocated by multiple attorneys to attendance at court conferences. As the docket sheet reflects and this Court recalls, all three of plaintiff's attorneys generally attended all conferences (with one exception on December 4, 2008). While the time records do not include entries by each of the attorneys for all of these appearances, they do include entries for all three on October 24, 2007 and April 29, 2008 and entries for two of them on September 6, 2006, December 14, 2007 and December 4, 2008. Had Mulé alone attended those conferences, his time would amount to $825. Had either Dellinger or Kammholz attended these conferences alone, his time would amount to $1,312.50. Taken together, however, the time charged by all three (calculated using the reasonable hourly rates determined in the previous section) totals $2,700. This is excessive. *See Simmonds*, 2008 WL 4303474 at *6 ("the district court must account for duplicative or repetitive work to ensure that the . . . fees represent only work that was necessary to the litigation and a cost efficient use of co-counsel and outside counsel") (internal quotation omitted).

In my judgment, the inclusion of approximately 77 hours for "meeting" time is also unreasonably high. Of that time, the overwhelming majority, or approximately 50 hours, reflects meetings between and among Mulé, Kammholz and Dellinger. About 30 of those hours were devoted to meetings among the three of them, while the remaining hours were logged for meetings between either Mulé and Kammholz, or Mulé and Dellinger. An additional seven hours is attributed to email and telephonic communications between Mulé, Kammholz and Dellinger. Although attorneys working on the same case must confer with one another from time to time to discuss case developments and strategy and to allocate tasks, I believe that a paying client would likely object to a bill reflecting more than one full week of internal attorney

conferences and communications.  *See, e.g.*, *Simmonds*, 2008 WL 4303474 at *7 (finding

across-the-board reduction "necessary to correct for the inefficiencies resulting from the

co-counsel arrangement" and noting that plaintiff's attorneys spent approximately 60 of a total of

552 hours corresponding with one another and discussing the case internally); *Rozell*, 576

F. Supp. 2d at 541, 543 (finding excessive 363 hours spent on conferences between plaintiffs'

counsel when measured against total hours claimed of 3,896); *See also Anderson*, 388

F. Supp. 2d at 165 ("[d]ivision of labor is supposed to make work more efficient, not less").

      Finally, defendant objects to the amount of time reflected for two tasks in

particular – the drafting of plaintiff's summary judgment motion and the depositions of the

defense witnesses.  (Docket # 52 at 17).  As to the latter, defendant maintains that plaintiff

deposed an excessive number of witnesses.[8]  Although I agree that the amount of time spent by

all three attorneys on deposition-related tasks was excessive (as explained above), I disagree that

time should be disallowed on the grounds that plaintiff deposed more witnesses than was

reasonable.  Plaintiff took seven depositions over the course of only two days.  No showing has

been made that any of the witnesses lacked relevant knowledge, and plaintiff's counsel has

affirmed that plaintiff relied on their testimony in her summary judgment motion.  (Docket # 55

at ¶ 27).  Considering those circumstances, as well as the fact that the depositions were taken in

accordance with this Court's discovery deadlines (*see* Docket ## 19, 23), I do not find that time

should be disallowed on the grounds that plaintiff conducted an excessive number of depositions.

---

[8]  Defendant's memorandum states that twelve depositions were conducted.  (*Id*. at 17).  That is wrong.
Plaintiff deposed seven witnesses.  (Docket # 55 at ¶¶ 29-30).

I also reject defendant's contention that the time spent on plaintiff's summary judgment motion should be excluded as unnecessarily incurred considering that the parties were only $4,000 apart in their settlement positions at the time of the motion. (Docket # 52 at 17). This argument is unpersuasive for two reasons. First, the summary judgment deadline was the day after the mediation (Docket # 32), and the Court was unwilling to extend it for a seventh time. Had plaintiff not filed her motion, she would have forfeited her right to seek summary judgment. Second, based upon my knowledge of the parties' positions during the mediation, I disagree with the assertion that the parties were only $4,000 apart. The principal difference in their positions was not how they valued plaintiff's legal claims, but the fact that the defendant was unwilling at that time to consider submitting the issue of attorneys' fees to the Court for determination. On that issue – the amount of attorneys' fees – the parties were unsurprisingly quite far apart.

In sum, to account for the excessive and redundant hours claimed, as well as the insufficiency and inaccuracy of a much smaller number of hours, this Court finds that the total hours requested should be reduced by twenty percent. The total fee awarded is set forth in Section E below.

### D. <u>Limited Success</u>

Finally, defendant contends that a separate twenty percent reduction is appropriate to reflect what it characterizes as the plaintiff's limited success in this litigation. (Docket # 52 at 18-19). Specifically, defendant maintains that such a reduction is appropriate to account for the fact that the settlement agreement provides for monetary relief only, rather than monetary and

injunctive relief as plaintiff had requested in her complaint. (*Id*. at 18). I disagree that any reduction is appropriate on this basis.

It is well-settled that the most critical factor in a court's determination of a reasonable fee is the "degree of success obtained" by the plaintiff. *Farrar v. Hobby*, 506 U.S. at 114; *Hensley*, 461 U.S. at 436. *See also Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d at 152. The Supreme Court has counseled that in assessing whether an adjustment should be made to reflect a plaintiff's partial or limited success, "two questions must be addressed":

> First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Hensley*, 461 U.S. at 434.[9] The focus of the reviewing court should be upon "the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id*. at 435.

In this case, I easily conclude that counsel achieved an excellent result for plaintiff. *See Hensley*, 461 U.S. at 435 ("[w]here a plaintiff has obtained excellent results, [her] attorney should recover a fully compensatory fee"). While the amount that she was paid under the agreement may appear modest in comparison to some federal court settlements, it is not modest when compared to the twenty-one day period giving rise to her damage claim.

Moreover, I do not find that the time that plaintiff and her attorneys spent pursuing her related claim for injunctive claim was excessive and inappropriate. Plaintiff was

---

[9] Since *Hensley*, the Second Circuit has held that the doctrine of limited success "is not restricted . . . to cases of multiple discrete theories." *Kassim*, 415 F.3d at 256.

authorized to seek injunctive relief under both the ADA and the Rehabilitation Act.  Although

defendant eventually contended that plaintiff lacked standing to seek injunctive relief because she

was not a resident of RPC at the time of her lawsuit, I conclude that the merits of defendant's

position are far from clear.  Considering plaintiff's mental health history and her previous

hospitalizations,[10] plaintiff's argument that her claim falls within an exception to the mootness

doctrine was certainly not frivolous.  *See Honig v. Doe*, 484 U.S. 305, 323 (1988).  For these

reasons, I find that counsel's decision to pursue the demand for injunctive relief was not

unreasonable.

      In addition, I note that plaintiff's claim for injunctive relief was closely related to

her claim for monetary relief.  Both arose from the same common nucleus of facts – her

September 2005 twenty-one stay in the RPC's Alternative Living Program.  Indeed, a review of

plaintiff's counsel's time records reveals very few that are readily-identifiable as relating to her

claim for injunctive, rather than monetary, relief.

      Finally, although the parties dispute whether this lawsuit occasioned the

institutional changes that RPC made after the suit was filed, defendant's counsel certainly touted

them as inducements for plaintiff to settle the litigation on monetary terms alone (*see* Docket

# 69 (Defendant's Ex. 1)).  Once the changes were disclosed to plaintiff, she evidently agreed

that they were satisfactory because she promptly dropped the injunctive component from her

settlement demand.  The simple fact that the parties' settlement agreement did not include

injunctive terms does not require a reduction in either the compensable number of hours or the

---

[10]  These matters are not detailed in the written record before this Court, but were represented by counsel for plaintiff at oral argument of the pending motion.

presumptively reasonable fee.[11] *Hensley*, 461 U.S. at 435 n.11 ("a plaintiff who failed to recover damages but obtained injunctive relief, *or vice versa*, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time") (emphasis added).

Considering the relationship between the presumptively reasonable fee in this case and the results achieved by plaintiff, I find that no reduction is warranted on the grounds of limited or partial success. Stated another way, I find that the relief that plaintiff obtained in this litigation – judged by both quantitative and qualitative norms, *see Barfield*, 537 F.3d at 152 – justified the hours spent by her attorneys (except as noted in the previous section).

### E. Reasonable Fee

Applying the 20% reduction for excessive, vague, unrelated entries and adjusting Mulé's hourly rate to $165, this Court calculates the appropriate and reasonable fee award to be $75,885. That sum consists of fees in the amount of $49,335 for work performed by Mulé (299 hours x $165), $14,550 for work performed by Kammholz (58 hours x $250) and $12,000 for work performed by Dellinger (48 hours x $250).

### IV. Determination of Costs

In addition to her attorneys' fees, plaintiff seeks to recover $3,891 in costs incurred for court reporting fees, interpretive services, printing and reproduction costs. (Docket

---

[11]  Where a plaintiff's sole claim for relief is injunctive, the defendant's voluntary adoption of the requested injunctive measures may moot the claim and deprive the plaintiff of the right to recover attorneys' fees. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. at 609-10 (rejecting "catalyst theory" as permissible basis for award of attorneys' fees). This case is readily distinguishable from *Buckhannon* by virtue of the negotiated monetary payment that plaintiff recovered.

# 49 at ¶ 12; # 54 at 10).  Plaintiff's request appears reasonable and justified, and defendant does not contend otherwise.  (*See* Docket # 52 at 19).


## CONCLUSION

For the reasons discussed above, plaintiff's motion for attorneys' fees (**Docket # 47**) is **GRANTED in PART and DENIED in PART**.  Plaintiff is awarded attorneys' fees in the amount of $75,885 and costs in the amount of $3,891.  Defendant is directed to pay plaintiff the total amount of $79,776 within thirty (30) days of the date of this Decision and Order.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September   30  , 2010

26